[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review of the File
This matter first came to the court by virtue of summons and complaint, dated January 12, 2001 and returnable to the court February 6th, in which complaint the plaintiff petitioner husband, proceeding initially in a pro se status, requested in the prayer for relief solely a dissolution of the marital union. The usual automatic orders were attached to the complaint as well as the return of the sheriff showing in-hand service on the defendant.
The defendant appeared by counsel pursuant to an appearance filed CT Page 1651 January 29, 2001 and, incident to that appearance, filed a motion for alimony pendente lite, as well as an answer and a cross complaint, and in the cross complaint of the defendant, the defendant claimed a dissolution of the marriage, alimony, an equitable division of property, allocation of debt, an allowance to prosecute, restoration of maiden name and such other relief as the court deems fair and equitable.
The plaintiff then secured counsel who filed an appearance with the court on March 2, 2001 and, incident to filing said appearance, filed a request for extension of time pendente lite, a motion for an allocation of debt pendente lite. Subsequently, the defendant's counsel filed an objection to the plaintiff's request for extension of time and the parties undertook to execute a stipulation which was filed with the court on March 19, 2001 whereby the plaintiff would comply with the defendant's request.
On April 11, 2001, the plaintiff filed a motion for exclusive possession of the marital residence and the same was the subject of a stipulation and agreement accepted by the court, Robaina, J., on July 2, 2001 and subsequently by the court, Dyer, J., on July 9, 2001.
The defendant filed a motion for contempt on April 16, 2001 as concerns matters pertaining to the Internal Revenue Service and the defendant filed on May 11, 2001 a subsequent motion for alimony pendente lite.
The court notes a subsequent appearance on behalf of the plaintiff filed by counsel on May 18, 2001.
On June 6, 2001, the defendant filed a certain motion having to do with a yacht owned by the parties and requests incident thereto which was the subject of a stipulation by the parties on July 9, 2001 accepted by the court, Dyer, J.
The file contains a detailed agreement undertaken by the parties bearing the date of June 26, 2001 as concerns the use of the yacht by the parties. (See also in the file a stipulation dated July 9, 2001 in furtherance of the afore noted agreement as concerns the use of the yacht by the parties.)
On October 4, 2001, new counsel appeared for the defendant and incident to that filing, filed a motion for immediate trial dated October 11, 2001.
The plaintiff and the defendant with their respective counsel and witnesses appeared before the court on January 24, 2002 and January 25, 2002 and the matter was heard to a conclusion. CT Page 1652
The court makes the following findings of fact:
The plaintiff and the defendant were united in marriage on January 2, 1993 at Dover, Massachusetts.
The defendant's birth name was Martin.
Both the plaintiff and the defendant have resided in this state for more than one year prior to the initiation of these proceedings.
The marriage has irretrievably broken down with no reasonable prospect for reconciliation.
There are no minor children issue of this marital relationship.
Neither party has been the recipient of welfare from the state or any town, city, municipality or subdivision thereof.
There was no evidence that a written antenuptial agreement preceded the marital union.
At the time of the marriage, the defendant was a serving officer in the United States Coast Guard. At the time of the marriage, the plaintiff was also employed in a like capacity as a serving officer of the United States Coast Guard.
The plaintiff's subsequent retirement was not voluntary according to the testimony.
The defendant's subsequent retirement from the service was voluntary.
At the time of the marriage of the parties, the defendant owned no real estate.
The defendant now has a home and residence of her own which was purchased on May 1, 2001.
Previously, the parties had resided together in a marital residence located on Bayberry Court, which is located in the town of Mystic.
Since leaving the marital residence of the parties and moving into her new premises, the defendant has made no contribution to the mortgage on the Mystic property.
While residing with the plaintiff, the defendant's testimony was to the CT Page 1653 effect that she did not contribute to any joint bank accounts nor pay any real estate taxes.
The defendant's claim was to the effect that she paid a sewer or sanitary charge on the Mystic premises in the amount of $3,000.00. This payment, according to the defendant, was accomplished by giving a check in that amount to plaintiff's counsel.
While the parties resided together, the defendant only paid one utility bill.
The plaintiff owns certain real estate in Maine in company with a brother and a separate property which is solely in the plaintiff's name.
The defendant has no interest of record in the Maine properties and has made no payments or contributions incident to the same during the marriage. One of the properties is a Victorian cottage apparently on the ocean and the other property is located in interior upstate Maine.
The Maine property has apparently been in the plaintiff's family prior to the marriage of the parties. In addition, there is a 34-foot Tartan sailboat in which the parties both claim to have an interest. In addition to that, a vessel described as a rowboat and, in addition, a 13-foot Boston Whaler.
According to the testimony, the Tartan sailboat was initially in both names. The purchase price thereof was to the amount of $60,000.00. The defendant apparently did not pay anything incident to acquiring the vessel. The vessel presently is located at Southwest Harbor in Maine. The defendant has not contributed toward maintaining the vessel.
The aforementioned Boston Whaler, according to the testimony, is in the name of the defendant and is registered in Connecticut.
According to the testimony, the defendant initially had no operator's license as is required under Connecticut statutes as concerns operating the Boston Whaler in Connecticut waters.
The outboard engine that powered the Boston Whaler has at one point in time been replaced.
There was no indication that the defendant contributed to the cost thereof.
Originally, the Boston Whaler was brought to Connecticut from Louisiana. CT Page 1654
During the pleasant weather months in the summer, the defendant on occasion would use or be on the Tartan sailboat.
The defendant, according to the testimony, has not operated the vessel on her own nor taken any extended trips.
The defendant has operated the Boston Whaler by herself and allegedly at this juncture does have a Connecticut operator's license for that purpose.
Both the plaintiff and the defendant have children by prior marital unions.
The defendant receives child support in the amount of $400.00 a month as concerns a prior union. The child being a child of the defendant incident to a prior union. This child, according to the testimony, is now 15 years old, resided in the former joint marital residence of the parties, and now resides with the defendant. The child attends Choate Rosemary School and the defendant pays for that educational process.
The aforementioned 15-year old daughter of the defendant was an adopted child and there are certain assets to which this child is entitled which was identified as a sovereign custodial account set up by the defendant's former spouse.
The plaintiff has a daughter in college who attends Bowdoin College in Maine. The plaintiff pays for his daughter's education pursuant to apparently a prior decree incident to a former marriage.
The plaintiff and the defendant during this marital union have each paid out various sums for the welfare, betterment and education of the aforementioned children issue of prior unions.
The defendant testified that she had made certain cosmetic improvements to the cottage in Maine and had contributed a large China cabinet as a part of the furnishings. The defendant indicated that she had engaged in decorating, provided linens, kitchen items, a TV and a VCR that were her property.
The defendant apparently did not find this Maine cabin too attractive in the sense that it had no running water and outdoor facilities. The defendant only visited this structure once a year. The other Maine location was visited more frequently by the defendant and her testimony was to the effect that she had made some cosmetic interior changes and claimed to have done some landscaping work there, including the purchase of two lamps. CT Page 1655
At the time of the marriage of the parties, the defendant moved into the Mystic residence and claimed that she did certain interior cosmetics and participated in landscaping. The defendant claims she assisted in the renovation of the kitchen and did some painting, that she planted flowers; that the cost thereof was to the amount of $200.00. In addition, the defendant claimed as to the Mystic property that she did some landscaping which cost between $500.00 and $800.00 and some stenciling work in the bathroom.
For her existing residence, the defendant's monthly cost for the mortgage is $346.00. This apparently includes real estate taxes.
During the subject marriage, the plaintiff paid for any and all matters of insurance, including both real estate and motor vehicles.
The defendant worked during the marriage either as an officer in the United States Coast Guard or in subsequent activities, including work as a librarian or teacher.
The defendant's position was to the effect that her contributions to the Bayberry Mystic property were in the category of quality of life issues.
The defendant's family comes from Louisiana.
The defendant claimed that she provided membership at the Mystic Seaport for the parties and provided some medical coverage and that she paid for some vacations during the marital union.
During the term of this marital union, the defendant and her daughter resided in the premises for a period of at least eight years.
During a major portion of the marital union, the defendant had a maid to assist her in maintaining and keeping the home and residence.
The defendant characterized marriage as similar to a computer; hardware and software.
The defendant spent 26 years in the United States Coast Guard and at one point, prior to the marital union, owned a 24-foot sloop sailing vessel.
The defendant represented that she has sailed on the United States Coast Guard ship the Eagle. CT Page 1656
The Tartan sailboat was purchased during the marriage of the parties and it was the claim by the defendant that she did some maintenance work thereon and the defendant requests of the court that she be entitled to the vessel.
The defendant indicated that she had incurred $16,000.00 worth of attorney's fees so far in the proceedings and wants the plaintiff to pay a portion thereof.
The defendant makes no claim for the property described as the Maine cottage in Southport, Maine nor the structure in Waterford, Maine.
The defendant characterized her contribution to the marital union as domestic.
The defendant's daughter's name is Jamie.
Prior to the marriage of the parties, the plaintiff had owned certain property in Mississippi and sold the same. This was sold during the marriage. The defendant indicating that she had not, in her words, seen any of the proceeds.
Incident to the manner in which the parties' filed income tax returns for the last year, the defendant represented that the additional cost to her was $3,700.00 whereas if they had filed jointly, the result would have been much different.
According to the defendant, the plaintiff has been retired from the Coast Guard for about six years and according to the defendant, he has not been employed on a full-time basis since that time.
The defendant's attitude with regard to the cause of the breakdown of the marriage was that communication between the parties became difficult and then impossible.
During this marital union, the parties kept their finances separately.
The defendant, apparently in 1998, underwent knee surgery.
The defendant acknowledged that when the plaintiff retired from the Coast Guard that his income dropped by as much as 40 or 50%.
The parties during the marriage, on one occasion, had taken a trip to Japan.
The defendant's age is 51. She characterized her health as good. Her CT Page 1657 education is to the following effect: the defendant has a bachelor's degree from Louisiana State secured in 1972. The defendant secured a master's degree from Webster University in 1976 and a second master's degree at Southern Connecticut State College in 2001.
The defendant served for 26 years in the United States Coast Guard and at the time of her release from the service held the rank of Captain. She retired in 1998. Her specialty while a serving officer of the Coast Guard was in matters of education and training.
The defendant represented that she had undergone a hysterectomy, suffered certain disabling pain in the shoulder and claimed partial loss of hearing.
The defendant is presently employed on a full-time basis as a teacher.
This is the defendant's fourth marriage; no children issue of this marriage. The child living with the defendant presently is an adopted child. The adoption having been effected during the third marriage. This is a marriage of approximately nine years.
The plaintiff retired in 1996.
The defendant acknowledged that there were no problems during the marital union involving alcohol or drugs and that there were no instances of physical violence or abuse between the parties. It seems that communication between the parties merely stopped.
The property presently owned by the defendant is located on Meridian Street in the town of Groton. It is in the defendant's name alone.
The defendant indicated that she was not aware of any indiscretions during the course of the marriage on the part of the plaintiff.
The defendant receives certain funds incident to her retirement and her Veterans Administration status that are in a tax-free situation amounting to as much as 30% of what the defendant receives.
The defendant, on inquiry by the court, indicated that she made no request for periodic alimony.
In his testimony, the plaintiff affirmed the testimony of the defendant with regard to the date and place of the marriage, the wife's maiden name, that there was no welfare, that there were no problems as to alcohol, drugs or physical violence. The plaintiff characterized the problems of the marriage as one where the parties never came together and CT Page 1658 communication was a distinct problem. Apparently there were some financial difficulties that also arose and the testimony was to the effect that in matters of intimacy that the union fell apart as of the first day of the marriage and became pretty much a closed door.
The plaintiff felt that there was an emotional breakdown between the parties, that they did not share any time together, there was no emotional bonding and the effect of the termination of matters of affection or intimacy commencing almost immediately in the union.
The plaintiff characterized the union as one involving a strained relationship, that the union never grew or developed.
In matters of finance, the plaintiff covered all of the expenses pertaining to the marriage, honeymoon and so forth, and in due course, placed the defendant's name on a Coast Guard Federal Credit Union account. It was the plaintiff's claim that the defendant was immoderate with regard to her use of this account.
The residence occupied by the plaintiff at 6 Bayberry Court was one which he has owned since 1974. At one point in time, mindful of his being in the service of the Coast Guard, the property had been rented.
Incident to said property, during the pendency of this marital union, the plaintiff paid for practically all of the utilities, mortgage, taxes, insurance and matters of like nature.
The plaintiff acknowledged that the defendant made some intangible contributions to the home. The finances of each of the parties were generally kept separate and distinct.
It was the plaintiff's position that in some financial matters that the defendant failed to disclose an item of income or assets as far as tax returns were concerned and the plaintiff's claim was that the defendant under withheld with regard to income which she received, which had the result later on of making a substantially greater tax liability at the times that the returns were filed. Any monies determined to be due and owing to the Internal Revenue Service were paid by the plaintiff.
Until their respective retirements, the incomes of both of the parties were somewhat similar. At the time of the plaintiff's retirement in July of 1996, his income was in the neighborhood of $90,000.00 a year. After retirement, it dropped by approximately 50% to $45,000.00.
At the time of his retirement, the plaintiff also received the sum of $10,000.00 for accrued, unused leave. These monies were used in part to CT Page 1659 pay for the Tartan sailboat.
The property owned by the plaintiff in Mississippi was purchased in the early 1980's and owned by the plaintiff at the time of the marriage of the parties.
At different points of time, that Mississippi property had been rented. It was subsequently sold for $78,000.00. With those funds, the plaintiff set up an account for his child's education; that is the child Hannah. The account was in the amount of $51,000.00±. The plaintiff is required to pay the child's educational expenses pursuant to a prior dissolution decree. As noted, the plaintiff's daughter attends Bowdoin. The plaintiff pays all costs and expenses incident thereto to the amount of $37,000.00 a year; this being for two semesters.
The plaintiff, some time ago, cashed in certain savings bonds that he had accumulated in the Fall of 2001 incident to putting together the requisite funds to pay the above-noted $37,000.00 for the child's educational purposes.
Since retiring, the plaintiff has done consulting for what was known as Operation Sail, some consulting work for the Government. He has been a project manager for a lobster restoration activity.
The Tartan sailboat referred to was purchased in 1993 and the plaintiff took out a home equity loan for the purpose of paying for the same.
It is the plaintiff's claim and position that he has paid the entire price of the vessel plus all costs of maintenance and matters of like nature.
The plaintiff's position is that the defendant contributed no more than some cosmetics or loose gear, cushions, matters of like nature, with regard to the boat.
The plaintiff verified that the Boston Whaler is in the name of the defendant and was purchased for $1,500.00.
The plaintiff is age 54. His education consisted of attendance and graduation from the New London Coast Guard Academy with a bachelor's degree in Special Engineering. Subsequently, the plaintiff secured a master's degree from the University of Rhode Island and he has stood for a civil engineering license for possible prospective employment.
The plaintiff characterized his health as good. CT Page 1660
The plaintiff touched on some physical limitations on the part of the defendant with regard to her agility and going up and down stairs. The plaintiff indicated the different types of housework that he did to try to facilitate matters in the home.
It is the plaintiff's intention to continue with the education of his daughter.
The plaintiff verified that he alone has been responsible for the care and maintenance of the Tartan sailboat, that he participated in various sailing activities at the Coast Guard and was an instructor in some aspects thereof at one time.
At one point in his career, the plaintiff served as the executive officer on the Coast Guard Barque Eagle. He has coached the sailing team at the New London Academy.
The title to the Bayberry Court property is solely in the name of the plaintiff
The plaintiff's prior marital union resulted in a dissolution which occurred in August of 1987.
As a lay witness for purposes of valuation of the home and residence, the plaintiff valued the property at $220,000.00.
On occasions during the marital union, the plaintiff and the defendant did travel to Louisiana. As earlier noted, there was a one-week trip taken to Japan. All travel and costs and allied matters were paid for by the plaintiff.
At the time of her vacating the former marital residence, the defendant removed various and sundry items of personal property to her new home, which is a condominium. The same consisting of two truckloads of goods and wares.
In the category of intimacies between the parties, the plaintiff's emphatic testimony was to the effect that it was a closed door after the first day of the marriage and his expectations and hopes were soon dashed.
The parties had some discussions with regard to a termination of the marriage in the summer of 1998 at which time, according to the plaintiff, the defendant indicated that, in her words, she "would look for someone better." CT Page 1661
In addition, according to the plaintiff, he was told by the defendant that "should you secure an attorney, that your life will be made miserable."
The plaintiff characterized his home life as being in the category of being the manager of a hotel.
From the exhibits, the court finds:
Plaintiff's Exhibit A, the 1993 federal income tax return for the plaintiff and the defendant. The income consisted principally of wages by the two parties amounting to $117,878.00. There were no W-2 slips attached to the exhibit showing the itemized breakdown.
Plaintiff's B, 1994 joint return of the parties, wages of the two parties amounting to $122,510.00. Again, no W-2's attached to the return showing the itemized breakdown.
Plaintiff's Exhibit C, the 1995 federal income tax return of the parties showing the total salaries of the plaintiff and the defendant for that year, $128,445.00. Again, no W-2's attached indicating the respective itemized breakdown.
Plaintiff's Exhibit D, the 1996 federal income tax return for the parties showing a total of the wages of $113,607.00. This exhibit does indicate the respective amounts received by the parties from earnings with the Coast Guard; as to the plaintiff, $48,828.47; as to the defendant, $64,778.40.
Plaintiff's Exhibit E, the 1997 federal income tax return showing wages of $71,899.00; a capital gain of $31,405.00; pension benefits and income of $47,328.00; totaling $155,875.00.
Plaintiff's Exhibit F, the 1998 return for the parties showing wages of $69,556.00; pension and annuities, $55,888.00 and other allied small amounts for a total joint income of $136,825.00.
Plaintiff's Exhibit G, the 1999 tax return for the parties. This exhibit does not contain a complete copy of the federal income tax return and only a portion of the State return and is difficult to decipher.
Plaintiff's Exhibit H, the 2000 tax return filed by the plaintiff individually showing total income of $77,021.00. The same being made up principally from pensions, some capital gain and business income.
Plaintiff's Exhibit I is a tax statement for 2001 for the plaintiff CT Page 1662 indicating income in the amount of $51,870.36; the plaintiff's employer being a governmental entity, United States Coast Guard Human Resource Service and Information Center.
Plaintiff's Exhibit J is a copy of a document entitled "Certificate of a Corporation known as MFGC Technologies" incorporated in the State of Rhode Island and in which corporation the plaintiff is listed as a director.
Plaintiff's Exhibit K is an itemized breakdown of expenses pertaining to the Tartan yacht including its cost which is in the neighborhood of $60,000.00, various and sundry expenses incident thereto, a verification of the vessel being documented, a bill of sale from the prior owner and establishment of the manner of payment which was provided entirely by the plaintiff.
Plaintiff's Exhibit L, an exhibit pertaining to the Boston Whaler verifying its purchase price of $1,800.00 and the manner in which it was paid for. It appearing that the vessel was paid for by the plaintiff. A portion of the exhibit also shows that the title to the Boston Whaler was taken in the name of the defendant.
Plaintiff's Exhibit M is a closing statement with regard to the sale of the Mississippi property by the plaintiff occurring January 14, 1997 and showing the selling price thereof; to wit, $78,000.00.
Plaintiff's Exhibit N, a statement from Fidelity Investments directed to the plaintiff indicating the value of two accounts as of December 31, 1992 to the amount of $59,036.34.
Plaintiff's Exhibit O, a statement from Fidelity Investments to the plaintiff, again, verifying balances and investment portfolio or mutual funds belonging to the plaintiff. The same for the period through January 15, 1993. The total amount being $32,165.26.
Plaintiff's Exhibit P, another investment report from Fidelity Investments to the plaintiff showing valuation of two accounts in the amount of $52,450.61 and $109,090.29, respectively.
Plaintiff's Exhibit Q, another Fidelity account showing valuations of two accounts. This statement being dated January 21, 2002; a traditional IRA at $67,995.21 and an individual account at $80,630.70. These in the name of the plaintiff.
Plaintiff's Exhibit R, statement from Navy Federal Credit Union showing an ending balance of $519.70. CT Page 1663
Plaintiff's Exhibit S, Navy Federal Credit Union account showing a balance of $121.93.
Plaintiff's Exhibit T, Navy Federal Credit Union showing a balance in the name of the plaintiff at $39,355.09.
Plaintiff's Exhibit U is a graph showing financial levels of the plaintiff as reflected on the graph between the period November 1993 and November 2000 and reflecting a home equity balance.
Plaintiff's Exhibit V, Department of Transportation, Coast Guard allotment worksheet which provides a wide variety of financial information of a detailed nature including insurance, medical, dental benefits and expenses and matters of like nature.
Plaintiff's Exhibit W, a document entitled "Comparative Income" of the plaintiff and the defendant for the period 1993 to the year 2000.
Plaintiff's Exhibit X is a comparative income graph and drawing to the same purpose as Exhibit W.
Plaintiff's Exhibit Y is a statement with graphs attached showing comparative expenses and matters of like nature for the period 1993 to 2002 for the respective parties.
Plaintiff's Exhibit Z entitled "Investment Review of Rebecca D. Colburn," as of December 31, 2000. This exhibit in part has to do with information pertaining to the sovereign account and the minor child of a former union being the beneficiary thereof; market value and present value.
Plaintiff's Exhibit AA, tax assessments by the Town of Stonington for the former marital residence for the years 1986 through 2001. The 2001 assessment at 70% of fair market value is $114,910.00. Expanded to 100%, it is $164,157.14.
Plaintiff's Exhibit BB has to do with a certain purchase of a successor outboard motor for the Boston Whaler to the amount of $2,236.39.
Defendant's Exhibits 1 through 10 are a series of photographs showing the Mystic residence, certain personal photographs showing the defendant and her minor child, the subject vessel Tartan sloop, certain interior pictures of the Mystic residence and a picture of the Maine cottage.
Defendant's Exhibit 12, a variety of e-mail messages, but among other CT Page 1664 material within the confines of that exhibit, a copy of the defendant's federal income tax return for the year 2000 showing total income of $51,090.00 including wages of $13,936.00 and pension benefits of $33,157.00 plus other small allied items.
Defendant's Exhibit 13, a document from Wide Horizons for Children, Inc., relative to the adoption by the defendant of the minor child with her that is not issue of this marriage. The same dated March 24, 1994.
Defendant's Exhibit 14, statement from Fidelity Investments directed to the plaintiff showing total portfolio value of $174,514.75.
Defendant's Exhibit 11, another statement to the plaintiff from Mutual Fund IRA showing fair market value of the plaintiff's IRA portfolio as of December 31, 1997, $61,586.45.
Defendant's Exhibit 15, a document with photographs and various and sundry allied material entitled "Complete Appraisal Summary Report, Appraisal of Property located at 6 Bayberry Court, Stonington (Mystic, Connecticut) by G.B. Erb Appraisal Co." On the face of the document are the words "single family residence drive-by inspection". This as of August 15, 2001 and the valuation shown by this drive-by inspection was to the amount of $290,000.00 for the 6 Bayberry Court property. How the author of the appraisal could have valued the property as he did for the value ascribed to the same without having made a close and careful physical examination of the same is presently unknown to the court.
Defendant's Exhibit 16 purports to be the cover of an L.L. Bean Summer 1997 sale catalog where the claim is to the effect that the picture shown on the face thereof, which is a porch with a rocking chair in it and a flag, to be from the Maine cottage owned by the plaintiff.
Defendant's Exhibit 17 is a statement from the defendant having to do with expenses that she incurred, however, there are few dollar amounts attached to any of the items. The document was submitted in support of the defendant's claim of her contribution to the former marital home and residence.
From the respective financial affidavits filed by the parties, as concerns the plaintiff, his present occupation is listed as marine consultant and self-employed. Gross weekly wage from principal employment, $1,064.38. This is actually his pension from the Coast Guard. Appropriate deductions for taxes, etc., $385.95 for a net of $678.43. Additional modest income from cottage rental in Maine, gross weekly, $61.30; deductions, $18.99 for a net from other sources of $42.31 for a total net weekly income of $720.74. Total weekly expenses as CT Page 1665 reflected on the affidavit amount to $755.28. Debts shown on the plaintiff's affidavit amount to $20,600.00. The 6 Bayberry Court, Mystic property, which is solely owned by the plaintiff; is valued at $220,000.00; a mortgage of $39,355.00 for an equity of $180,645.00. As to the two properties in Maine, one apparently is in the sole name of the plaintiff in Waterford, Maine valued at $35,000.00; the other property in Southport, Maine in which the plaintiff has a one-half interest with a sibling, valued at $125,000.00; a 1987 Mercedes, $5,000.00; a 1993 Subaru, $3,000.00. The sailboat is valued at $30,000.00; the Whaler at $1,200.00; bank accounts, Fidelity, NFCU, checking and savings total $5,513.85; mutual funds, savings bonds, etc., total $93,665.01; cash value of insurance appears to be $2,780.85; an IRA with Fidelity, $67,995.21; an academy ring and accounts receivable from MFCG, $10,000.00. Total cash value of all assets as reflected on the affidavit amount to $564,299.92.
As to the financial affidavit of the defendant, her occupation is listed as a teacher employed by the Old Saybrook Board of Education. Gross weekly wage from her employment, $769.00; appropriate deductions, $221.62 for a net of $547.38. Additional income from United States Coast Guard, $1,101.14; deductions, $258.03 for a net of $843.11; total net weekly income, $1,390.49. Listed expenses which include the mortgage payment on the defendant's new residence, her auto loan, school tuition for her daughter, etc., total, $1,181.56. Debt shown as $7,500.00. The defendant's residence on Meridian Street in Groton valued at $160,000.00 with a very modest equity by virtue apparently of its relatively recent purchase. A 1999 Honda motor vehicle with a minus equity. The defendant claiming an interest in the Tartan sailboat and a computer and an additional vessel and miscellaneous personalty to the amount of $36,600.00. $8,151.00 in the bank. Stocks, bonds, mutual funds, Fidelity, USAA, TRPrice, total $22,433.00; no cash value shown for life insurance. The affidavit reflects the custodial account for the defendant's daughter valued at $22,383.00. Savings bonds, $5,700.00; E-Trade, $1,144.00 for a total of all assets of $174,401.00.
 The Law
The court has considered all of the statutes which apply in matters of this nature which include without limitation Connecticut General Statutes (C.G.S.) § 46b-82 regarding alimony.
The court has considered all of the applicable case law that governs the matter.
The court has considered the testimony of the parties, their candor or lack thereof; the exhibits and the arguments of counsel. CT Page 1666
In considering the financial orders of the court, the court has considered the length of the marriage, the cause of the breakdown and dissolution, the age, health, station, occupation and employability of each of the parties and their respective estates and their respective needs.
The court has also considered the nature and the extent of their income and the state of their education.
The court has considered the respective financial positions of the plaintiff and the defendant, their prospects for future income and opportunities.
The court has considered the issue of fault for the breakdown of the marriage.
In addition, the court has considered the proposed orders submitted by counsel for the respective parties.
 Discussion
As of January 2, 2002, this is a marriage of 9 years; the second marriage for the plaintiff; the fourth for the defendant. There are no children issue of this marital union, minor or otherwise.
Both the plaintiff and the defendant are retired former high-ranking officers in the United States Coast Guard with the attendant substantial pension benefits. In each instance, the pension benefits were accrued and established in the main at a point in time prior to this marital union. Both of the parties are highly educated; particularly the defendant who has three separate degrees.
As concerns the Tartan sailboat, the same apparently when initially acquired a number of years ago was paid for entirely by the plaintiff and primarily used by him. The defendant's use being only intermittent.
The Maine properties, as to which the defendant makes no claim, were real estate and improvements thereon coming to the plaintiff through his family and presently with an interest to one of his siblings.
It would appear predicated upon the testimony received by the court that the plaintiff paid for practically all of the expenses during the course of the marriage. The defendant's contribution was of a nominal or cosmetic nature. CT Page 1667
The court notes that, according to the testimony, the defendant had a maid while the parties were residing together.
As concerns the defendant's reference to disability or infirmities, the court notes that no medical reports of any kind were submitted during the conduct of the proceedings.
There were admittedly no problems with regard to the immoderate use of alcohol, no resort to drugs, no physical violence or abuse and, as best the court can devine, no claimed indiscretions.
As noted in the body of the memorandum, at one point the defendant, according to the plaintiff; claimed that she would look for someone better.
It would appear that the marriage was ill-fated from the beginning. Apparently a lack of communication and certainly a lack of any warmth or intimacy apparently emanating primarily from the defendant. The exact reasons therefore are a matter of conjecture.
The court enters the following orders:
The plaintiff may retain his ownership of the real estate known as 6 Bayberry Court in Mystic which was acquired prior to the present marital union. The plaintiff shall continue to be solely responsible as concerns any mortgages, liens or taxes due thereon and save the defendant harmless should any claim be made against her as concerns said property.
The plaintiff may retain the cabin in Waterford, Maine which was in his family well prior to the present marital union.
The plaintiff may retain his interest in the cottage at Southport, Maine which he owns in company with a sibling brother.
The plaintiff may retain his 1987 Mercedes automobile and his 1993 Subaru automobile, both of which appear to be free and clear.
The plaintiff; having paid the full purchase price thereof; may retain the 30-foot sailboat known as Tartan class and be responsible for any taxes or charges that may exist as concerns said vessel, which according to the testimony is presently stored in Maine.
The plaintiff may retain the small rowboat or gig that was averted to in the testimony, presumably for the purpose of getting from the shore to the mooring. CT Page 1668
The defendant shall have and continue to own the Boston Whaler; payment for which was provided by the plaintiff but in whose name the registration has continued to the present time. The defendant may also retain the replacement engine attendant to said Boston Whaler.
The plaintiff may retain his pension from the United States Coast Guard, the major portion of which was accumulated prior to this marital union.
The plaintiff may retain his Fidelity FTID account, his NFCU checking account, his NFCU savings account. The plaintiff may retain his Fidelity mutual funds, any savings bonds that presently remain to him and his two shares of Quannapowitt Yacht Club shares.
The plaintiff may retain any cash value of life insurance as reflected upon his financial affidavit.
The plaintiff may retain the IRA Fidelity account shown in category G on his financial affidavit, his Coast Guard Academy ring and his accounts receivable from OT Foundation.
The defendant may retain as her sole and separate property her pension income from the United States Coast Guard free and clear of any claim by the plaintiff.
The defendant may retain and keep her ownership and record interest in her present home and residence on Meridian Street in the town of Groton.
The defendant may retain her 1999 Honda motor vehicle.
The defendant may retain her Navy FCU checking and savings account and her SeaWest checking and savings account.
The defendant may retain her Fidelity account, USAA account, TRPrice account.
No cash value of life insurance is shown on the defendant's return.
The defendant may keep the IRAs reflected in category G on her financial affidavit.
The defendant may continue to keep and have control over the sovereign account where she is custodian for her daughter, child of a prior union.
The defendant may retain the savings bonds shown on her affidavit, which again apparently are earmarked for her daughter's education. CT Page 1669
The defendant may retain her E-Trade account as shown on the financial affidavit.
On the basis of the evidence presented to the court and also mindful of the requests of the parties and the content of the proposed orders, the court enters no award of alimony as to either the plaintiff or the defendant.
As noted, each party shall maintain and have complete access and full control over their present outstanding pensions as a result of their having been honorably retired from the United States Coast Guard.
Each party shall be solely responsible for any debts shown on their respective affidavits. In the case of the defendant, the amount thereof appears to be $7,500.00 and in the case of the plaintiff; $20,600.00.
Notwithstanding the above, mindful of the claim by the defendant of her contribution to the marital union which she described as quality of life issues, the plaintiff shall pay to the defendant within 90 days the sum of $10,000.00. In addition, mindful of the defendant's request as concerns attorney's fees, but mindful also of the fact that no itemized statement has been presented on her behalf for the substantial amount that the defendant requests, the court will allow and grant the sum of $5,000.00.
The court proceeds on the premise that at the time that the defendant departed from the 6 Bayberry Court, Mystic property that she took all items of personalty which she was desirous of having mindful that two truckloads of contents were removed at the time of her departure by the defendant.
The parties may then each retain such items of personalty as are presently in their respective possessions including on the defendant's part the retention of her computer.
The court notes that in the cross complaint filed on behalf of the defendant that the defendant requested the restoration of her maiden name of Martin. The court then grants that request.
Each party shall be responsible for their respective attorney's fees except to the extent noted in this memorandum of decision.
The court has jurisdiction of the proceedings.
The court grants the relief prayed for and dissolves the marriage on CT Page 1670 the grounds of irretrievable breakdown and declares the parties to be single and unmarried.
Austin, J.